F I L E D

JUN 1 4 2010

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

First American Title Insurance Company, )
)
        Plaintiff, )
)
v. )
)
First Alliance Title, Inc., )     Civil Action No. 1:09-cv-403
)
     and )
)
Western Surety Company, )
)
        Defendants. )

## Memorandum Opinion

This matter comes before the Court on First American Title Insurance Company and

Western Surety Company's cross Motions for Summary Judgment (Dkt. nos. 44 and 52). After

hearing oral arguments on the Motions on January 15, 2010, the Court entered an Order (Dkt. no

68) extending the discovery window in this case and permitting the parties to thereafter file

briefs supplementing their original cross Motions for Summary Judgment. The parties have now

submitted those briefs and this matter is ripe for disposition.

For the reasons that follow, the Court GRANTS First American Title Insurance

Company's Motion for Summary Judgment (Dkt. no 44) and DENIES Western Surety

Company's Motion for Summary Judgment (Dkt. no. 52).

## I.    Background

This action arises from a real estate transaction gone awry. Michael S. Krause

("Krause"), an owner of real property in Alexandria, Virginia, sought to refinance his mortgage

with SunTrust Mortgage, Incorporated ("SunTrust"). As part of the refinancing process, Plaintiff

First American Title Insurance Company ("FATIC") underwrote Defendant First Alliance Title

Company ("First Alliance")'s title insurance policy on the Alexandria property. As required by

the Virginia Consumer Real Estate Settlement Protection Act (CRESPA), Virginia Code §§ 6.1-2.19, *et seq.*, First Alliance obtained a $100,000 surety bond from Western Surety Company ("Western"). It is now undisputed that First Alliance diverted the funds received from SunTrust designated to pay off the original mortgages on the property, relegating SunTrust's interests in the property to a position of priority behind the original mortgagor. The original mortgagor's subsequent foreclosure on the home following Krause's failure to pay the original mortgage rendered SunTrust's interests unsecured, compelling SunTrust to lodge a claim on the title insurance policy underwritten by FATIC, which FATIC paid.

FATIC subsequently initiated this action against Western and First Alliance, asserting common law claims for breach of contract and asserting damages in the amount of $100,000, the full amount of the Bond.

## II.    Procedural Posture

On March 13, 2009, FATIC initiated this matter by filing its Complaint in the Circuit Court for the County of Fairfax, Virginia. Defendants removed the case to this Court on April 14, 2009. Western then moved to dismiss the action. (Dkt. no. 2). In denying Western's motion to dismiss, the Court held that CRESPA did not preclude common law claims against the surety bond, that FATIC had standing to assert a direct cause of action for breach of contract against Western as an aggrieved party, but that FATIC could not seek recovery under a theory of assignment from First Alliance. *See* May 27, 2009 Memo. Opinion (Dkt no. 15). Western subsequently filed its Answer on June 9, 2009.[1] FATIC filed its Motion for Summary Judgment (Dkt. no. 44) on November 9, 2009 and Western filed its own Motion for Summary Judgment

---

[1] The Court also subsequently denied Defendant's Motion for a Supplemental Order Certifying the Court's May 27, 2009 Memorandum Opinion and Order for Interlocutory Appeal and Motion for Joinder of Necessary Parties on July 17, 2009. (Dkt. no. 31).

(Dkt. no. 52) on December 31, 2009. Pursuant to the Court's January 15, 2010 Order, the parties filed their supplemental briefs on March 11, 2010.

## III. Legal Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The non-moving party must go beyond the pleadings and mere allegations to "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 323. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## IV. Undisputed Material Facts

The material undisputed facts in this case are as follows.

In attempting to refinance the lending arrangement on his residential property in Alexandria, Krause obtained two loans in the amount of $676,800.00 and $125,200.00, respectively, from SunTrust. SunTrust instructed that the funds from loans were to be used to pay off loans from the original mortgagor, EMC Mortgage Company ("EMC"), which held two Deeds of Trust in its favor on the property.

On October 19, 2006, First Alliance entered into a "Limited Agency Agreement" with FATIC. First Alliance's President was Ms. Ana M. McDonald. While the scope of FATIC and

3

First Alliance's relationship is disputed as a matter of law, the parties agree that the purpose of FATIC's retention of First Alliance as its agent was, at least in part, to solicit and originate title insurance business. In this capacity, First Alliance issued title insurance commitments for the refinance transaction on Krause's property to SunTrust on behalf of FATIC, which became effective February 10, 2006. FATIC also issued "closing protection letters" to SunTrust, which, broadly speaking, indicated FATIC's agreement to reimburse SunTrust for losses it might incur in the refinancing process.

It is undisputed that First Alliance also acted as the settlement agent in the refinance transaction, and accordingly posted a $100,000 bond (the "Bond") on October 12, 2006 which Western issued. The Bond named First Alliance as principal and the Commonwealth of Virginia as obligee. First Alliance conducted the settlement for the refinance transaction on November 20, 2006. As part of that transaction, First Alliance received the funds from the two SunTrust loans with closing instructions from SunTrust to pay off and discharge the EMC loans.

As noted, it is uncontested that First Alliance failed to apply the SunTrust loan funds to satisfy the EMC loans. As a result, SunTrust's refinance mortgages were not placed in first and second priority on the property as SunTrust intended, but were instead relegated to third and fourth position, behind EMC's first and second-priority mortgages. When Krause defaulted the original mortgages, EMC foreclosed on the property, effectively erasing SunTrust's interest in the property and causing a loss of the loan funds in the amount of $734,296.09.[2] SunTrust

---

[2] As Western notes in its Supplemental Brief, on June 18, 2008, FATIC sent a letter denying SunTrust's claim relating to the Second Deed of Trust. Accordingly, Western argues that the only loss incurred by FATIC relates to payment by FATIC to SunTrust with regard to the First Deed of Trust. Western points to inconsistencies in FATIC's response to Western's Interrogatory No. 2 relating to this issue, but as the remainder of this Opinion makes clear, this dispute is immaterial because FATIC still qualified as an "aggrieved person" with losses in excess of the $100,000 value of the Bond. Western's own evidence indicates that FATIC made payments in the total amount of $734,296.09, as evidenced by two checks made payable to Joseph V. Bounassissi, one in the amount of $500,000 and the other for the remaining $234,296.00. Western Supp. Ex. A-3, Doc. no. 45-24.

subsequently made a claim on the title insurance policy underwritten by FATIC, which FATIC paid. FATIC terminated its relationship with First Alliance on December 13, 2007.

FATIC then initiated an action against First Alliance and a number of other defendants, including Krause and McDonald, in Fairfax Circuit Court on January 2, 2008 alleging claims under the Wet Settlement Act, in addition to fraud, breach of contract, negligence, and other common law claims. FATIC also sent a demand for payment under the Bond for $100,000 to Western by letter on November 7, 2008.[3] In the November 7 letter, FATIC informed Western of the pending Fairfax County action and enclosed the complaint filed in that suit. Western responded by letter on November 11, 2008, denying the claim. FATIC sent another letter to Western on November 18, 2008, asking Western to reconsider its denial. Western acknowledged receipt of FATIC's November 18 letter in a letter dated December 1, 2008, but took no action to pay on the Bond. FATIC and First Alliance then reached a resolution in the Fairfax County litigation and entered into a settlement (the "Settlement Agreement") on December 9, 2008.[4] The Fairfax County Circuit Court thereafter entered a consent judgment on February 20, 2009 in favor of FATIC in the amount of $734,296.09 against First Alliance and $182,000 against Ms. McDonald. The Settlement Agreement also directed Steadfast Insurance, First Alliance's errors and omissions insurer, to pay $100,000 under a policy held by First Alliance.

Western continues to refuse to pay on the Bond, which gives rise to the current action. In its Complaint, FATIC asserts three common law claims for breach of contract against Western Surety and First Alliance Title, and seeks damages of $100,000, the full amount of the surety bond.

---

[3] Krause filed a voluntary petition for Chapter 7 Bankruptcy in May of 2009.
[4] Ana McDonald was also a party to the Settlement Agreement. FATIC had already obtained a default judgment against Krause on September 26, 2008 in the amount of $828,074.99.

For the reasons that follow, the Court concludes that Western Surety is liable for the full amount of surety bond, $100,000.

## V.    Analysis

"The law regards the sanctity of contracts and requires the parties to do what they have agreed to do." *Samuel H. Cottrell & Son v. Smokeless Fuel Co.*, 148 F. 594 (4th Cir. 1906) (citing *Dermott v. Jones*, 69 U.S. 1, 6 (1864)). The undisputed material facts reveal that this is ultimately a case in which Western is simply bound to do that which it has agreed to do.

The Bond at issue in this case provides that Western is "held and firmly bound . . . to any aggrieved person who may be injured by the Principal." FATIC Ex. 4. Under the plain language of the Bond, "*any aggrieved person* may maintain an action in its own name against this bond to recover damages as a result of the Principal breaching any of the [laws enumerated in the bond]." *Id.* (emphasis added). As the Court already held in its May 27, 2009 Opinion, FATIC may bring an action against the Bond as an "aggrieved person." Because FATIC may recover its damages on this basis, the Court need not address Plaintiff's additional grounds for recovery.[5]

Western argues that it escapes liability to FATIC under the Bond on three grounds: 1) the Settlement Agreement between FATIC and First Alliance worked to extinguish Western's liability; 2) First Alliance acted as FATIC's agent, such that FATIC is precluded from recovering for the misconduct of its own agent; and 3) FATIC took other action(s) which prejudiced Western's rights and preclude FATIC from recovering. The Court addresses and rejects each in turn.

---

[5] FATIC argues that it may also recover on the Bond as a subrogee of SunTrust, as the third-party beneficiary of the surety bond, and that that First Alliance assigned FATIC its right to sue on the bond.

## A. The Effect of the Settlement Agreement Between FATIC and First Alliance

The Court first turns to whether the settlement between First Alliance and FATIC agreement released Western from liability.

On January 2, 2008 FATIC filed suit against First Alliance in the Circuit Court for Fairfax County, Virginia alleging claims both as the subrogated insurer of SunTrust and in its own capacity for, *inter alia*, fraud, conversion, and breach of contract. FATIC and First Alliance subsequently entered into the Settlement Agreement, FATIC Ex. 23, dated December 9, 2008. The circuit court signed a final order entering the parties' consent judgment on February 20, 2009. FATIC Ex. 24. The documentary evidence in the record establishes that Western had notice of the Fairfax County action by November 7, 2008 at the latest, when FATIC notified Western of the suit by a letter making a demand for payment under the Bond,[6] to which Western responded on November 11, 2008, refusing payment. Western now argues that FATIC cannot qualify as an "aggrieved person" under the terms of the Bond because FATIC released Western's principal, First Alliance, in the Settlement Agreement. Western further argues that it cannot be

---

[6] In its Supplemental Brief, Western points to the deposition testimony of Deborah Asero, FATIC's corporate designee. Specifically, Western states that "Ms. Asero admitted that she authorized the claim letter which was sent to [Western] against the [Bond], dated November 27, 2008, that this letter was the first notice of claim sent to [Western] against the [Bond], and further acknowledged that, at the time the claim letter was sent, the underlying claim was either about to be settled or was in fact settled." Western Supp. Br. at 3 (emphasis added). However, the documentary evidence in the record includes a claim letter clearly dated November 7, 2008 that FATIC addressed to Western, and a November 11, 2008 letter written by Western that states "[Western] acknowledges receipt of your written communication. . . dated November 7, 2008." Regarding Asero's deposition, the Court refrains from weighing the credibility of any testimony, but notes that Asero never admitted that November 27, 2008 was the first notice of FATIC's claim against the Bond, nor did she admit that FATIC's claim against First Alliance had been or was about to be settled on November 27. Asero does initially respond on p. 59 of her deposition that she believed the suit may have been settled on November 7, but subsequently indicated that she was unsure of the date of settlement and generally demonstrated that she had little knowledge of when communications were sent or why such communications were sent at a given time. Asero Depo. at 59-61.

Ultimately, the Court regards Asero's testimony as largely immaterial to the issue of whether Western had sufficient notice and an opportunity to defend against the Fairfax County litigation. As discussed *infra*, the undisputed factual evidence demonstrates that Western took the position that only a Virginia licensing authority was entitled to bring an action to recover under the Bond. Western's assumption of this position, not any surprise or lack of notice, explains Western's inaction action toward the Fairfax County suit.

bound by the terms of the Settlement Agreement or the subsequent February 20, 2009 consent judgment because it lacked sufficient notice of the action.

### i. The "Release" of First Alliance

There is no dispute as to the well-settled principle that "a release of a principal debtor by the creditor by an absolute release of the debt . . . without consent of the surety, releases the surety *in toto*." *Conner v. West*, 129 Va. 85, 96 (Va. 1921). Further, "a release by the creditor, without the consent of the surety, of any perfected lien or fund or property held by the creditor in such a way that he has a legal right to apply it in satisfaction of the whole or any part of the debt, release the surety *pro tanto*. . . ." *Id.*; *see also Chichester v. Mason*, 34 Va. 244 (Va. 1836) ("[A] surety paying the debt is entitled to stand in the place of the creditor, and to have all of his securities transferred to him; and if the creditor has discharged any of these . . . he shall be precluded from so much of his demand against the surety, as this latter might have obtained if the transfer could have been made"). This principle recognizes the harm incurred by a surety upon such a release because the surety would ordinarily have the equitable right to indemnity from the principal after paying the principal's debt. *See Dickenson v. Charles*, 173 Va. 393, 400 (Va. 1939).

This does not mean, however, that *any* settlement or agreement between a creditor and debtor necessarily functions as a complete release of a surety's liability. In assenting to the Settlement Agreement and agreeing to entry of the February 20, 2009 consent judgment, First Alliance conceded its liability on the breach of contract and Wet Settlement Act claims, with its liability totaling $734,296.09, plus attorneys' fees and costs. FATIC did not release its claims against First Alliance without consideration or consequence. To the contrary, FATIC attained a

valid and enforceable judgment against First Alliance and Western is entitled to subrogate to FATIC's right to enforce the consent judgment.

Western relies heavily on the Fourth Circuit's decision in *Food Lion v. S.L. Nusbaum*, 202 F.3d 223 (4th Cir. 2000), in which the creditor, Food Lion, sought recovery from a surety after a principal defaulted on several construction contracts. Food Lion settled its dispute with the debtor, and that settlement was memorialized by a bankruptcy court order approving the settlement and indicating that the creditor would have no future claims against the debtor for the costs attendant to the project. Thus, the Fourth Circuit concluded, "Food Lion's release of [the debtor] also operated as a release of [the debtor's] surety. . . " *Id.* at 226. However, unlike the settlement and ensuing order in *Food Lion*, the settlement here between FATIC and First Alliance merely memorialized FATIC's entitlement to recover from First Alliance and, if anything, indicates FATIC's intent to recover fully from First Alliance. The consent judgment entered by the Circuit Court for Fairfax County did not extinguish First Alliance's liability and did not operate as a release of Western as First Alliance's surety.

While Western's real concerns are likely aimed at the probability of any actual recovery from First Alliance, the Court must conclude that, as a matter of law, Western remains bound by its obligations arising under the Bond.

### ii. Notice and Opportunity to Defend

Western also argues that it cannot be bound by the terms of the Settlement Agreement or the February 20, 2009 consent judgment because it was given inadequate notice of the Fairfax County action and was unable to defend its interests in that action.

The law requires only that a surety have notice and an opportunity to defend before it is bound by a judgment against its principal. *Am. Safety Cas. Ins. v. C.G. Mitchell Constr., Inc.*,

268 Va. 340, 350 (Va. 2004) (upholding lower court's conclusion that a surety was bound by the default judgment entered against its principal, even though default was entered as a discovery sanction); *see also Drill South, Inc. v. Int'l Fid. Ins. Co.*, 234 F.3d 1232, 1236 (11th Cir. 2000). This rule recognizes that a surety "should not be permitted to stand back and allow a judgment to be taken setting the amount of recovery against its principal without similarly being bound by the judgment." *Drill South*, 234 F.3d at 1236.

As noted, Western's own evidence demonstrates that it received notice of the Fairfax County action on November 7, 2009. The Settlement Agreement between FATIC and First Alliance is dated December 9, 2008, and the ensuing Final Order entering the consent judgment was not signed until February 20, 2009, over four months after Western received notice of the action. This gap in time alone stands as a strong indication that Western had sufficient time to involve itself in the suit.

Western's admissions further confirm this point. On March 3, 2010, counsel for FATIC deposed Lisa Jennings-Baroun ("Ms. Jennings"), Western's FED. R. CIV. P. 30(b)(6) corporate designee. In her deposition, Ms. Jennings reveals Western's inaction regarding the pending Fairfax County action:

> Q: Between November 18, 2008 and February 10, 2009, when Western Surety denied the claim again, did Western Surety, directly or indirectly through its attorneys, take any steps to become involved in the underlying action between First American and First Alliance
> A: No.
> Q: Between November 18, 2008 and February 10, 2009 . . . did Western Surety, directly or indirectly through its attorneys, make any efforts to find out additional information regarding the underlying action between First American and first Alliance?
> A: Not on this file, no. . .
> . . .
> Q: Between November 18, 2008 and February 10, 2009, did Western Surety undertake any efforts to become involved in the underlying action between First American and First Alliance?

A: No, that – we would have no reason to intervene. That was between you --- pursuant to your contract and agreement with your agent.

Jennings Depo. at 87-88, ln. 16-25, 1-2. Ms. Jennings further confirmed that Western received full notice of the suit in November of 2008:

Q: And, in fact, First American had provided information to Western Surety when it submitted its claim in November 2008 in the form of the complaint and the attachments to the complaint, correct?
A: That's a fair statement that you provided documentation, yes.

*Id.* at 91, ln. 12-17. Rather, than seeking to intervene in the action, Western appears to have simply taken the position that it was not liable to FATIC on the Bond and took no further steps based on that position:

Q: Okay . . . Based on the position that Western Surety took with respect to the claim under the bond, there was no reason for Western Surety to take any action to become involved in the lawsuit between First American and First Alliance, correct?
A: Correct.

*Id.* at 92-93, ln. 22-25; 1-3.

The Court concludes from Western's own admissions that it had adequate notice of the consent judgment and ample opportunity to represent its interests, but simply failed to do so. Western offers no evidence that it made any effort whatsoever to take part in or object to the negotiations preceding the Settlement Agreement. Further, Western offers no evidence that it attempted to object or intervene prior to the entry of judgment in Fairfax County Circuit Court. Rather, Western took the posture that only a Virginia licensing authority was entitled to bring an action to recover under the Bond, thus declining to pay on the Bond upon FATIC's request or take any other action relative to the pending Fairfax County action.

Western was aware of the pending action and the interests at stake therein and had ample opportunity to defend its interests had it chosen to do so.

**B. Whether First Alliance Acted as FATIC's Settlement Agent**

Western next asserts two related arguments that FATIC is not entitled to recover because First Alliance acted as FATIC's own agent in causing the damages asserted.[7] The Court finds no merit to either.

First, Western argues that the title insurance policy issued by FATIC was "defective" because the policy issued did not contain exceptions for the EMC liens already encumbering Krause's property. Thus, according to Western, First Alliance's issuance of a "defective" policy is the cause of FATIC's losses, and because First Alliance acted as FATIC's agent in issuing the title insurance, it would be unjust to allow FATIC to recover for the acts of its own agent.

While it is certainly true that a principal "cannot recover for an injury suffered by him in consequence of the negligence of his own agent," *Southern Pac. Co. v. Pool*, 160 U.S. 438, 445 (1896), Western's argument conflates the cause of FATIC's losses in this case. Without citing any authority, Western argues that "[i]t is not the mishandling of the settlement funds that triggered FATIC's policy liability it is the issuance of a policy without exception for the [pre-existing] liens and the subsequent claim against the title coverage." Dkt. no. 54; Def. Br. at 17.

The Court rejects this argument because it is apparent that SunTrust's losses, and consequently FATIC's obligation to pay, were wholly caused by First Alliance's mishandling of the settlement funds. Even if it would have been a wise business practice to do so, Western cites no authority which places an affirmative obligation upon FATIC to have included exclusions in the policy for the pre-existing liens. Furthermore, as FATIC notes, while securing the release of the liens was a requirement for First Alliance in issuing the policies, the policies were issued nonetheless and remained valid and enforceable. It was First Alliance's misappropriation of the

---

[7] As noted above, in the Court's May 27, 2009 Opinion, the Court held that FATIC was precluded from recovering under a theory of assignment from First Alliance, as the bond does not permit the Principal to bring an action in its own name, and therefore First Alliance had no such right of recovery to assign to FATIC.

settlement funds that permitted the liens to remain in place and ultimately led to SunTrust's loss. Western's attempt to circumvent the effect of First Alliance's misconduct by placing the onus on FATIC's drafting of the policy proves unavailing.

Second, Western argues that First Alliance acted as FATIC's *settlement* agent in conducting the closing, and thus FATIC is precluded from recovering for the misconduct of its own agent.

Under Virginia law, the determining factor when evaluating whether an agency relationship exists is the principal's power of control. *Va. Employment Comm'n v. A.I.M. Corp.*, 225 Va. 338, 345-49 (1983); *Naccash v. Burger*, 223 Va. 406, 417 (1982). "Actual control, however, is not the test; it is the right to control which is determinative." *Whitfield v. Whittaker Mem'l Hosp.*, 210 Va. 176 (1969). In other words, "[t]he question is not whether the party exercises control over the agent, but whether he has it." *Butterworth v. Integrated Resources Equity Corp.*, 680 F.Supp. 784, 789 (E.D.Va. 1988) (citing *Texas Co. v. Zeigler*, 177 Va. 557, 564 (Va. 1941)). Whether an agency relationship exists is a question of law when that inquiry may be made on the basis of unambiguous written documents or undisputed facts. *McLean Contr. Co. v. Waterman S.S. Corp.*, 277 F.3d 477, 479 (4th Cir. 2002).

Specifically in the context of real estate transactions, "an issuing agent may, in accordance with an agency contract, wear 'two hats,' one as an agent to issue or sell title insurer's insurance policies, and the other as a settlement agent to conduct closings on his or her own behalf," and thus, "[i]n such cases, the title insurer is responsible only for the title insurance issued. . . ." *Nat'l Mortgage Warehouse, LLC v. Bankers First Mortgage Co., Inc.*, 190 F.Supp.2d 774, 780 (D.Md. 2002) (applying Maryland law but citing authority from a number of jurisdictions). So, while a title agent may "wear two hats" and act as both a title and settlement

13

agent, the Court looks to the nature of the relationship and the purported principal's right to control in order to determine whether an agency relationship actually existed between the parties.

As noted, there is no dispute between the parties that First Alliance acted as FATIC's agent in soliciting and issuing title insurance. More specifically, pursuant to the October 19, 2006 "Limited Agency Agreement" executed by FATIC and First Alliance, First Alliance was given the authority to solicit and originate title insurance business, to collect premiums, and to sign and issue commitments and policies. Def. Ex. 2 at 2. However, the Agreement expressly provides that First Alliance's "authority to act for and/or on behalf of [FATIC] is expressly limited to those actions specifically set forth herein and shall not include any other activity, implied or otherwise." *Id.* at ¶5. Further, the Agreement unambiguously prohibited First Alliance from participating in "[a]ny activity in the capacity of . . . [a] settlement or closing entity" on behalf of FATIC. *Id.*

i.      **Closing Protection Letters**

As part of the refinancing transaction, FATIC issued "Virginia Closing Protection Letters" ("Closing Protection Letters") in favor of SunTrust on November 10, 2006. FATIC Ex. 11 and 12. The Closing Protection Letters generally indicated FATIC's assent to reimburse SunTrust for losses that might ensue if the authorized title insurance agent failed to comply with SunTrust's closing instructions. *Id.*

Western essentially concedes that the Limited Agency Agreement between FATIC and First Alliance initially limited the scope of First Alliance's authority solely to that of a title insurance agent. However, Western argues that language used in the Closing Protection Letters effectively superseded this limitation such that First Alliance should also be deemed FATIC's agent in conducting the settlement of the refinancing transaction on Krause's property.

Specifically, Western points to a clause in the Closing Protection Letters which states it will indemnify the lender, SunTrust, for particular losses connected to "closings when conducted by the above referenced Agent (an agent authorized to issue title insurance for the [FATIC]). . ." FATIC Exs. 11,12. Thus, Western argues, this provision in the Closing Protection Letters which names First Alliance as the "approved agent" indicates that First Alliance acted as its agent in conducting the settlement.

On this issue, the Court finds a recent decision from this District, *Wells Fargo Bank, N.A. v. Old Republic Nat. Title Ins. Co.*, 2009 WL 4927145, at *7 (E.D.Va. December 17, 2009), directly on point.[8] In *Old Republic*, the same entity acted as both the title insurance agent and settlement agent in a single real estate transaction. In attempting to hold the title insurer liable for the fraudulent acts of its title insurance agent, a lender argued that the offending title agent acted as the insurer's agent while the conducting the closing. Rejecting this argument, the Court held that neither CRESPA nor the specific terms of the agency agreement in that case dictated that the title insurer was to be held accountable for its title agent's settlement and escrow activities. *Id.*

Like Western in this case, the lender in *Old Republic* relied heavily on the insurer's issuance of closing protection letters as evidence that the title agent was also working as the insurer's settlement agent. In rejecting the lender's reliance on the closing protection letters, the court noted that "[t]his argument ignores the fact that the use of a closing protection letter confirms that the settlement agent is not an agent of the title company because a closing protection letter is issued precisely because a title insurer is not liable for the actions of its title

---

[8] Western's objections to FATIC's citation to *Old Republic* and other cases in FATIC's supplemental brief is unavailing. In its January 15, 2010 Order, the Court imposed no limitation precluding the parties from providing further authority for their positions in their supplemental briefs. Furthermore, the Court clearly may consider any relevant authority before issuing its decision in this matter.

insurance agent." *Id.* *See also Proctor v. Metropolitan Money Store Corp.*, 579 F.Supp.2d 724, 738 (D.Md. 2008) (noting that "a closing protection letter is issued precisely because, in its absence, a title insurer is not liable for the actions of its title insurance agent") (citations omitted). Indeed, "[f]ar from evidencing an agency relationship, a closing protection cuts the other way, demonstrating the need for additional protection because of the absence of agency liability." *Proctor*, 579 F. Supp. 2d at 738. Western's argument, without citing any authority, that "[l]ogically, a title insurer such as FATIC that issues a closing protection letter is liable for misconduct by a settlement agent" directly contravenes this established understanding of closing protection letters.

Indeed, closing protection letters function to protect *lenders* when settlement agents engage in fraud or other misconduct, and are issued precisely because the lender cannot typically hold a title insurer liable in their absence. *See* James Bruce Davis, *The Law of Closing Protection Letters*, 36 TORT & INS. L.J. 845, 847 (2001) ("An overwhelming majority of courts have held that, in the absence of a closing protection letter, a title insurer would have no liability for a settlement agent's fraud or dishonesty in connection with a mortgage loan closing."); *see also Nat'l Mortgage Warehouse*, 190 F.Supp.2d at 781 (D.Md. 2002) ("[A]n issuing agent is not cloaked with apparent authority to conduct closings on the insurer's behalf merely because the insurer has issued closing protection letters for it in the past.") (citations omitted). The Closing Protection Letters issued by FATIC in this case are better understood as a measure taken for SunTrust's benefit necessitated by the absence of an agency relationship, and certainly should not be construed as establishing a relationship which Western can now avail itself of in order to escape liability under the Bond. Moreover, that the Closing Protection Letters enumerate the condition that First Alliance would act as both the title insurance agent and the settlement agent

does not establish, or even indicate, that FATIC exercised any degree of control over First Alliance in conducting the settlement.

The Court finds no basis in the Closing Protection Letters upon which it can conclude an agency relationship existed between FATIC and First Alliance for the purpose of conducting the settlement.

### ii.    Other Grounds for an Agency Relationship

Expanding the inquiry beyond just the Closing Protection Letters and placing the Letters in context with the other evidence submitted in the record regarding FATIC and First Alliance's relationship, the Court still finds no basis to construe First Alliance as FATIC's agent in conducting the settlement.

As noted, the proper inquiry under Virginia law in determining whether an agency relationship exists is one of control. *Butterworth v. Integrated Res. Equity Corp.*, 680 F.Supp. 784, 789 (E.D.Va. 1988). Even if the Court is unable to discern that an agency relationship was explicitly created, a principal may still be held liable under the related, but distinct doctrines of apparent authority or apparent agency. *Sanchez v. Medicorp Health System*, 270 Va. 299, 304 (Va. 2005). Apparent authority is "[a]uthority that a third party reasonably believes an agent has, based on the third party's dealings with the principal, even though the principal did not confer or intend to confer the authority." *Id.* Apparent authority "presupposes the existence of an agency relationship and concerns merely the [scope of] authority of the agent." *Id.* (citations omitted). By contrast, under a theory of apparent agency, or agency by estoppel, an agency relationship is "created by operation of law and established by a principal's actions that would reasonably lead a third person to conclude that an agency exists." *Id.*; *see also TYC Development Co., LLC v. Birach Broadcasting Corp.*, 2010 WL 1740793, at *6 (E.D.Va. Apr. 27, 2010).

Though the Supreme Court of Virginia has instructed "that there is a distinction between the terms that should not be blurred," *Sanchez*, 270 Va. at 304, n.4, the Court addresses them simultaneously here, as neither theory provides a basis for imputing liability to FATIC for First Alliance's actions in conducting the settlement.[9]

Despite Western's arguments to the contrary, the undisputed factual evidence in this case does not indicate that FATIC benefited from or retained any right to control First Alliance's activities as a settlement agent.

For instance, that FATIC subjected First Alliance to two escrow audits after the closing, but before SunTrust submitted its claims on the title insurance policies, does not function as any indicia of FATIC's control over First Alliance. If anything, the audits evince a lack of control over and absence of knowledge regarding First Alliance's settlement activities.

Further, there is no evidence that FATIC attained any benefit from First Alliance functioning as the settlement agent in the refinancing transaction. Though First Alliance continues to lean heavily on the language of the Closing Protection Letters which provides that First Alliance will function as the settlement agent, there is no indication in the Letters or otherwise that First Alliance doing so necessarily benefited FATIC in any way.

Western can point to no express act in which FATIC authorized First Alliance to act as its settlement agent nor did FATIC take any action that would cause a third party to reasonably

___

[9] The doctrine of apparent authority clearly appears more relevant to this case given that the parties agree that at least a limited agency relationship existed, but the Court addresses both doctrines because it is not entirely clear to the Court whether Western's argument is that the scope of this initial agency was broadened by the acts of FATIC or that a wholly separate agency was somehow created for the purpose of conducting the settlement. In either instance, the proper inquiry looks to the whether FATIC's actions would lead a third party to reasonably believe First Alliance acted as its agent. *See, e.g., Wright v. Shortridge*, 194 Va. 346, 352-53 (1952); *see also TYC Development*, 2010 WL 1740793, at *6 (E.D.Va. Apr. 27, 2010) (likewise noting that "[f]or purposes of this case, this is a distinction without a difference. Under both doctrines, Plaintiff must demonstrate that it had a reasonable belief that [the putative agent] had the authority to act on behalf of [the putative principal]...and that Plaintiff's belief was based on its dealings with [the putative principal].").

believe that First Alliance was FATIC's settlement agent during the refinancing transaction. First Alliance did not act as FATIC's agent in conducting the refinancing settlement and Western cannot escape liability under the terms of Bond on this basis.

## C. Whether FATIC Otherwise "Prejudiced Western's Rights"

Finally, Western advances the argument that it would be inequitable to allow FATIC to recover on the Bond because FATIC impaired Western's security or collateral, thereby impairing its rights as a surety. This argument is obviously interrelated with Western's argument above regarding the effect of the Settlement Agreement between FATIC and First Alliance. Namely, Western again points to the judgment FATIC obtained against First Alliance, in addition to those obtained against Ms. McDonald and Mr. Krause and the funds FATIC recovered from the errors and omissions insurance policy held by First Alliance. Western further argues that FATIC's actions also included "the marshalling of First Alliance's assets and accounts and the exhaustion of all possible sources of recovery that would normally have been available to [Western] pursuant to its rights of indemnity against First Alliance, as well as its rights of exoneration." Western S.J. Mot. at 3.

Under Virginia law, it is generally the case that "if a creditor holding collateral security surrenders it to the debtor without the knowledge or consent of the surety on the debt, he thereby discharges [the surety], to the extent of the value of the property surrendered." *Morton v. Dillon*, 19 S.E. 654, 655 (Va. 1894); *see also Phoenix Ins. Co. v. Lester Bros., Inc.*, 203 Va. 802, 808 (Va. 1962). Likewise, a creditor's interference with a surety's right to subrogation may act to discharge the surety's liability. *Francisco's Adm'r v. Shelton's Ex'r*, 8 S.E. 789, 795 (Va. 1889). However, "[s]ome act of interference with the surety's right of subornation to a security, or a remedy, must be shown" before the surety will be deemed discharged. *Id.*

Western fails to demonstrate how the judgments obtained against First Alliance, McDonald, or Krause worked to deprive Western of the benefit of any collateral. Rather, Western merely repeats what FATIC freely admits: that FATIC actively sought and obtained judgments from numerous parties to recover the sum it paid on the SunTrust claim. Western fails to offer any viable argument that it had an interest in collateral which was surrendered or interfered with by FATIC. [10]

Rather, the Court is inclined to agree with FATIC that Western's actual complaint is with its inability to ultimately recover against First Alliance because its liabilities will exceed any assets Western might reach. Thus, the question is actually one of priority of recovery from these sources rather than any speculative and amorphous impairment of Western's rights as a surety. Western cites no authority and the Court is unable to find any, which would permit Western to escape liability on the Bond on these grounds. [11]

To the contrary, and as to the priority of a creditor's claims versus a surety's right to subrogation, "[t]he surety's right of subrogation does not ordinarily arise until the debt is paid in full. A partial payment of the debt, even though it may be of the full amount for which the surety is bound, will not entitle the surety to subrogation to the creditor's rights and securities." 23 WILLISTON ON CONTRACTS § 61:54 (4th ed.). This rule recognizes that if a surety were

---

[10] For example, in its Supplemental Brief, Western discusses FATIC's response to its Interrogatory no. 12, in which FATIC admitted it obtained several judgments and cash payments in its attempt to recoup its payment on SunTrust's claim. Western argues that "[t]hese facts support [Western]'s defense of prejudice to its rights, as FATIC has acted in such a way as to deprive [Western] of the opportunity to act in preservation of its own rights as FATIC has exhausted every avenue of possible recovery prior to filing suit against [Western]. FATIC's actions have therefore left [Western] without recourse of its own pursuant to its rights of indemnity and exoneration." Western Supp. Br. at 6-7. Western, however, fails to provide any authority which would impose a duty upon FATIC to abstain from seeking such relief or which would otherwise grant Western higher priority in recovering from the putative debtors.
[11] Relatedly, Western argues that it would have been subrogated to SunTrust's rights of recovery for any amount it paid to SunTrust under the Bond, and thus FATIC cannot enforce its subrogation rights because doing so would interfere with equal or superior equitable rights held by Western. *See American Sur. Co. of N.Y. v. White*, 142 Va. 1, 13 (Va. 1925). However, given that FATIC can recover directly as an "aggrieved party" under the Bond, the Court's judgment does not require an enforcement of FATIC's subrogation rights, and thus there is no issue regarding a potential conflict with equal or superior equitable rights held by Western.

subrogated to a creditor's rights before complete satisfaction of the creditor's claim, "the rights obtained by the [surety] through subrogation would compete with the remaining rights of the [creditor] pursuant to the underlying obligation, with the result that the remaining recovery of the [creditor] on account of the underlying obligation could be diminished," and because each party "would be asserting rights arising from the same undivided claim, conflicting enforcement efforts could easily result." RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTY § 27 cmt. b (1996) ("Restatement"); *see also Obici v. Furcron*, 160 Va. 351, 362 (Va. 1933) ("The right of subrogation cannot be enforced until the whole debt is paid, and until the creditor be wholly satisfied there ought to and can be no interference with his rights or his securities which might, even by bare possibility, prejudice or embarrass him in any way in the collection of the residue of his claim"); *Combs v. Agee*, 148 Va. 471, 475 (Va. 1927) (noting in the context of a note secured by a lien that "if the surety's payment does not discharge the debt in full, the surety's rights under the lien of the deed of trust are subordinate to and not superior to the rights of the original creditor who has the first lien for the balance due him"). Thus, to the extent that Western asserts a theoretical higher priority in recovery against First Alliance's assets over FATIC, that contention contravenes the established law of suretyship.

Lastly, in its supplemental briefing, Western places emphasis on the payout from First Alliance's errors and omissions insurance carrier. As noted, the Settlement Agreement directed Steadfast Insurance, First Alliance's errors and omissions insurer, to pay $100,000 under the policy held by First Alliance. Again without citing any authority, Western argues that this act functioned to prejudice Western's rights of recovery as a surety because the insurance policy carried a potential $1,000,000 in coverage but was settled for significantly less than this maximum value. Western, however, offers no evidence that First Alliance was entitled to

recover the full $1,000,000 from the errors and omissions policy or that Western should somehow be given higher priority in seeking to collect from the insurer as a potential subrogee of its principal.

While it is uncontroverted that a surety who pays a principal's creditor is typically subrogated to the creditor's claims against the principal, *see, e.g., Dickenson*, 173 Va. at 402, Western provides no authority for the proposition that FATIC should have been precluded from seeking the full sum of its recovery beyond the limited amount of the Bond simply because that recovery would cut into the assets needed to repay the surety. If anything, and as noted above, the law generally prefers a creditor's full recovery before giving effect to a surety's subrogation rights. *See* Restatement § 27 cmt. b; *Furcron*, 160 Va. at 362.

In sum, none of the foregoing "prejudicial" acts by FATIC relieve Western of its obligation to pay FATIC as an aggrieved party under the unambiguous terms of the Bond.

## VI.   Conclusion

For the foregoing reasons, GRANTS First American Title Insurance Company's Motion for Summary Judgment (Dkt. no 44) and DENIES Western Surety Company's Motion for Summary Judgment (Dkt. no. 52). Western is liable for the full amount of the Surety Bond, $100,000.00.

An appropriate order shall issue.

Alexandria, Virginia
June 14, 2010

/s/ _____
Liam O'Grady
United States District Judge

22